IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS, TRANSPORTATION DIVISION,[1] SMART-TD GENERAL COMMITTEE OF ADJUSTMENT GO-01, SMART-TD GCA GO-009, SMART-TD GCA GO-393, <br><br>                Plaintiffs, <br><br>   v. <br><br> BNSF RAILWAY COMPANY, <br><br>                Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | <br><br><br><br><br><br><br><br><br><br>No. 20 C 4220 <br><br>Honorable William T. Hart |

**OPINION AND ORDER**

Plaintiff International Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division ("SMART-TD" or the "Union")[2] brings this action under the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, against Defendant BNSF Railway Company ("BNSF") on behalf of the unionized Yard Foreman employees at BNSF. The Union alleges that BNSF is attempting to unilaterally alter the working conditions of the Yard Foreman position in Chicago and Seattle areas by requiring that the position becomes Engine Service Qualified without engaging in the mandatory collective bargaining process required by the Railway Labor Act. It seeks a declaration that BNSF's unilateral action violates the Act, and an injunction preventing a change to the requirements of the position until the parties engage in the mandatory bargaining

---

[1] Plaintiff International Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division is listed on the docket by its abbreviation "SMART Transportation Division" but by its full name in the complaint caption. (Dkt. 1, pg. 1.) The parties make no argument about the difference between the docket and the complaint caption, so the Court understands it to be immaterial. The Court draws its caption from the complaint.

[2] The parties use an "alphabet soup" of acronyms throughout their filings. The Court limits use of acronyms for the reader's ease. The Court capitalizes key turns for the reader's reference.

1

process required by the Act. The parties bring cross motions. (Dkt. 16; Dkt. 17.) This Court concludes the parties present a "minor" dispute that must be resolved via arbitration under the Act. Consequently, for the reasons set forth below, the Court grants BNSF's motion to dismiss for want of subject matter jurisdiction, (Dkt. 17.) and denies the Union's motion for summary judgment. (Dkt. 16.)

**I.     BACKGROUND**

This case involves the Yard Foreman position, a subset of the train service employees, at BNSF. (Dkt. 21-1, pg. at 4.) Train service and engine service employees are two categories of workers at BNSF. *Id*. at 2-3. Train service employees are represented by the Plaintiff Union, while a separate union, the Brotherhood of Locomotive Engineers and Trainmen, ("Engineers' Union") which is not party to this litigation, represents the engine service employees. *Id*. BNSF and the Union have entered into several collective bargaining agreements governing the terms and conditions of employment for the train service employees. *Id*. at 2.

The Union has a three-tier organization system with Plaintiff SMART-TD as the administrative head, mid-level semi-autonomous general committees of adjustment, that are responsible for negotiating and enforcing collective bargaining agreements with their respective railroads, and locals for the rank and file members. *Id*. at 1. The Union's structure is largely irrelevant to the case other than to note that three intermediate general committees of adjustment are also Plaintiffs in this action along with SMART-TD. The Court refers to the Plaintiffs as the "Union" unless a specific reference to the subpart of the Union is required.

The parties' dispute centers on whether BNSF may require the Yard Foreman position to be Engine Service Qualified. Federal law mandates that only a properly qualified worker may operate a locomotive. 49 C.F.R. § 240.1(a); (Dkt. 18-1, pg. 2.) In July 2020, BNSF notified the

Union of its intent to require the Yard Foreman position in Chicago and Seattle to be Engine Service Qualified. (Dkt. 21-1, pg. 9.)

The Yard Foreman is a freight conductor working in the rail yard. *Id*. at 4. When assigned to a yard switcher crew, the position is primarily responsible for the safe and proper switching of inbound and outbound trains. *Id*. Other duties of the Yard Foreman include: advising his or her crew on safety related issues, train movements, track switch alignments, the coupling and uncoupling of rail cars, air hose connections, air brake inspections when car department personnel are unavailable, and timekeeping for members of the yard crew. *Id*.

"Switching" consists of the sorting of rail cars onto various tracks and connecting them with each other and one or more locomotives to form trains. *Id*. This work can be performed in multiple methods including by a yard service crew or by an engineer operating the locomotive to move the train cars. *Id*. An additional method of switching, which is of importance to this case, is performed with a remote control device. *Id*. at 5. The remote control allows the Yard Foreman and an assistant, who is also a train service employee represented by the Union, to move the locomotive to conduct the switching without being on-board. *Id*.

Despite moving a locomotive via remote control when performing switching, the Yard Foreman position is not presently required to be Engine Service Qualified. (Dkt. 18, pg. 7.) The Union explains that the qualification is not required for the remote control work because the Yard Foreman is not operating the locomotive's controls, but instead is only "directing as he would do with an Engineer in the cab of the locomotive." (Dkt. 22-1, pg. 5.)

BNSF desires the Yard Foreman position to be Engine Service Qualified because there are times that the Yard Foreman cannot conduct the necessary switching work using the remote control. (Dkt. 18, pg. 7.) Some switching work must be done conventionally using the

3

locomotives throttle instead of via remote control. *Id*. BNSF wants the Yard Foreman to be able to perform the conventional movement of the locomotives during switching and so is now mandating that they be Engine Service Qualified. *Id*. The Court is uncertain whether there is a substantive difference between "directing" the locomotive via a remote control (which does not require the qualification) and operating the locomotive manually (which does) other than one requires a physical presence on the locomotive while the other does not. Regardless, it is clear that the parties do not dispute that the Yard Foreman may perform the remote control work without being Engine Service Qualified, and that BNSF now wants them to become qualified so they can perform manual movement of the locomotive.

The Union brings the present suit under the Railway Labor Act challenging BNSF's actions. The Union has an instant motion for summary judgment (Dkt. 16.) and BNSF responds with its own motion to dismiss for want of subject matter jurisdiction or in the alternative summary judgment. (Dkt. 17.) The Union argues that BNSF's attempt to alter the Yard Foreman position is a break with past agreements and practice making it a "major" dispute under the Act. As such, the Union claims it is entitled to an injunction prohibiting BNSF from unilaterally requiring that the Yard Foreman position be Engine Service Qualified and directing that they engage in collective bargaining on this point. BNSF counters that this is a "minor" dispute under the Act that must be resolved by the arbitrator, and the instant case should be dismissed for want of subject matter jurisdiction.

## II. Analysis

At the outset, the Court notes that BNSF moves to dismiss the case for want of subject matter jurisdiction or alternatively seeks a grant of summary judgment. At first blush, one might think the Court has subject matter jurisdiction to adjudicate this action. Subject matter jurisdiction

is the power of the Court to resolve the merits of the case before it. *Lightfoot v. Cendant Mortgage Corp.*, 137 S. Ct. 553, 562 (2017) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 583-85 (1999)). The complaint alleges that the Court has subject matter jurisdiction because the case presents a federal question under 28 U.S.C. § 1331, and involves an Act regulating commerce, 28 U.S.C. § 1337. (Dkt. 1, pg. 2.) Plaintiff is requesting the Court interpret a federal statute as it relates to the present dispute between the parties under the Court's Article III authority to address cases and controversies and order applicable relief. That would seem sufficient to establish subject matter jurisdiction.

The question, however, is complicated by this area of law. Historically, the Seventh Circuit instructs that a "minor" dispute that must be resolved via arbitration is within the exclusive jurisdiction of the arbitrator, and consequently, the federal court lacks subject matter jurisdiction over the case. *Brotherhood of Maint. Of Way Employees Division/IBT v. Norfolk S. R.R. Co.*, 745 F.3d 808, 815 (7th Cir. 2014) ("*Brotherhood 2014*"). The Court of Appeals has clarified, however, that its historical practice of dismissing for want of subject matter jurisdiction has not taken into consideration recent Supreme Court case law instructing that "whether a party's failure to meet a statutory requirement deprives federal courts of subject matter jurisdiction must be based on whether Congress clearly indicated that it was setting a jurisdictional limitation." *Carlson v. CST Transp., Inc.*, 758 F.3d 819, 831 (7th Cir. 2014) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510-11, 515-16 (2006)); *see also Miller v. Sw. Airlines Co.*, 926 F.3d 898, 901 (7th Cir. 2019) (recognizing issue). The Seventh Circuit has declined to consider whether the intervening Supreme Court case law alters its historical practice of dismissing "minor" disputes for want of subject matter jurisdiction. *See Miller*, 926 F.3d at 901; *Brotherhood 2014*, 758 F.3d at 831. Thus, the Seventh Circuit's case law on this point remains binding because this Court, as an inferior court

to the Seventh Circuit, has no authority to reexamine a superior court's precedents. *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir. 2002) ("[O]nly an express overruling relieves an inferior court of the duty to follow decisions on the books.").

A motion to dismiss for want of subject matter jurisdiction is governed by Rule 12(b)(1) of the Federal Rules of Civil Procedure. The moving party may assert either a "facial or factual attack on Plaintiff's allegations." *Bazile v. Finance Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020) (citations omitted). The facial attack takes the Plaintiff's factual allegations as true, but argues the facts as alleged do not establish the Court's jurisdiction. *Id*. Alternatively, a party may also bring a factual attack. *Id*. In that situation, the party may bring in evidence outside the pleadings in support of its argument that the Court lacks jurisdiction over the case. *Id*. BNSF's instant motion falls into this second category.

The Union's motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. "Summary judgment is proper 'where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.'" *Stelter v. Wisconsin Physicians Servs Ins. Corp.*, 950 F.3d 488, 490 (7th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). The Court examines the record in the light most favorable to the non-moving party and construes all reasonable inferences in its favor. *Steler*, 950 F.3d at 490 (citations omitted).

Turning to the merits, the Railway Labor Act of 1926 "governs much of the relationship between employees and employers in the railroad industry." *BLET GCA Up v. Union Pac. R.R. Co.*, 988 F.3d 409, 412 (7th Cir. 2021). Under the Act, employers may "modify 'rates of pay, rules, or working conditions of employees'" either "in accordance with any existing agreement or

[] through the bargaining and negotiating procedures prescribed in the [Act]." *Id*. (quoting 45 U.S.C. § 152 Seventh).

It is not the Court's role to resolve the underlying merits of the parties' instant dispute, but instead its place is "that of taxonomist." *Brotherhood of Locomotive Eng'rs and Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017) ("*Brotherhood 2017*"). The Court's sole task is to determine whether the parties present a "major" or "minor" dispute under the Act. *Id*. at 755-56. The phrase "major" and "minor" are "terms of art" under the Act. *Id*. at 756. "Whether a dispute is major or minor in no way relates to the court's estimation of the dispute's relative importance." *BLET GCA UP*, 988 F.3d at 412 (citing *Consolidated Rail Corp v. Railway Labor Executives Ass'n*, 491 U.S. 299, 305 (1989) ("*Conrail*")).

A "major" dispute is "a disagreement [that] arises over the formation or amendment of a collective bargaining agreement . . . ." *Brotherhood 2017*, 879 F.3d at 755 (citing *Conrail*, 491 U.S. at 302-03). When the parties have a "major" dispute, the Court may enter an injunction to maintain the status quo between the parties while they engage in the mandatory bargaining and mediation process established under the Act. *BLET GCA UP*, 988 F.3d at 412 (citing *Detroit & T.S.L.R. v. United Transp. Union*, 396 U.S. 142 (1969)).

A "minor" dispute "relates only to the interpretation of the application of an existing agreement. . . ." *Brotherhood 2017*, 879 F.3d at 756 (citing *Conrail*, 491 U.S. at 303). When faced with a "minor" dispute, the Court dismisses the case for want of jurisdiction and the parties must present their dispute to binding arbitration, traditionally before the National Railroad Adjustment Board. *BLET GCA UP*, 988 F.3d at 412-13 (citing *Conrail*, 491 U.S. at 303-04). A "minor change may take effect immediately, even if it must later be undone by order of the

arbitrator." *Brotherhood 2017*, 879 F.3d at 758. In sum, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302 (citing *Elgin J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945)).

The collective bargaining agreement for the Court to examine is a "'generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.'" *BLET GCA UP*, 988 F.3d at 413 (quoting *Conrail*, 491 U.S. at 311-12). "Thus, the relevant terms of an agreement are not only those that are written down; they are also included in the parties' practice, usage, and custom as they carry out their agreement." *Brotherhood 2017*, 879 F.3d at 758 (citation omitted). "'[A]ny well established practice that constitutes a 'course of dealing' between the carrier and employees' form part of the agreement the same as do any specific terms set out in the text of the agreement." *BLET GCA UP*, 988 F.3d at 413-14 (quoting *Railway Labor Exec. Ass'n v. Norfolk and W. R.R. Co.*, 833 F.2d 700, 705 (7th Cir. 1987)).

"When the parties disagree about the appropriate classification of a dispute, the party seeking to establish that a dispute is minor and under the exclusive arbitral jurisdiction of a RLA Adjustment Board faces a "relatively light burden." *Conrail*, 491 U.S. at 307, *Brotherhood 2014*, 745 F.3d at 813; *see also Brotherhood 2017*, 879 F.3d at 758 ("[T]here is a large thumb on the scale in favor of minor, and hence arbitration."). "If the railroad can articulate an argument that is 'neither insubstantial or frivolous, nor made in bad faith,'" that "its changes are only an interpretation or application of an existing [collective bargaining agreement]," then the result is the "Court lacks jurisdiction to do anything but dismiss the case and allow arbitration to go forward." *Brotherhood 2017*, 879 F.3d at 758 (quoting *Conrail*, 491 U.S. at 310). This is a "low bar" requiring the railroad to do "very little to show that this dispute is minor." *Brotherhood 2017*, 879 F.3d at 758. It is a "bar nonetheless," as "[n]aked assertions of past practice are not enough."

8

*Id*. "There must be some basis in the record to support the conclusion that the railroad, or the union as the case may be, put the relevant practice into effect." *Id*.

The Court concludes that BNSF provides sufficient evidence to satisfy the "low bar" to demonstrate the instant dispute between the parties is a "minor" one. *Id*. The parties provide several arguments, often at a granular level, about whether the dispute implicates an existing agreement between the parties. However, taking a step back and viewing the forest from the trees, the Court believes the issue becomes clear.

The record demonstrates the existence of a "well established practice that constitutes a 'course of dealing' between the carrier and employees," *BLET GCA UP*, 988 F.3d at 413, of the Yard Foreman participating in the switching process assembling individual train cars and locomotives into trains. Part of this practice is the Yard Foreman directing the locomotive's movement through remote control as the train cars are assembled. (Dkt. 22-1, pg. 5.) The instant dispute is caused by BNSF's desire for the Yard Foreman to not only direct the locomotive via the remote control, but at times step onto the locomotive and operate it conventionally using the hand controls while conducting the switching function. (Dkt. 18, pg. 7.) The record is unclear as to why a Yard Foreman "directing" the locomotive during switching via remote control does not need to be Engine Service Qualified, but effectively performing the same function conventionally while on the locomotive does. Regardless, what is clear is that this dispute arises out of the larger well established practice of the Yard Foreman using the locomotive as a tool to conduct the switching process.

A company's efforts to impose an additional requirement on the employee as part of a well established process is an indication that the dispute is "minor." *See Conrail*, 491 U.S. at 300-01, 313 (holding that railroad's unilateral imposition of mandatory drug testing during physical

9

examinations when it was previously performed when there was a concern over employee drug use was a "minor" dispute); *BLET GCA UP*, 988 F.3d at 411, 414 (holding unilateral alteration to existing attendance policy presented "minor" dispute). The parties' well established practice demonstrate the existence of an existing agreement governing the Yard Foreman's work switching trains. The instant dispute as to whether the Yard Foreman position can be required to be Engine Service Qualified implicates an existing agreement, and so is a "minor" dispute that must be resolved by the arbitrator.

The Court pauses to note at this point that it is not resolving the underlying dispute about the Yard Foreman's responsibilities because that question is for the arbitrator to resolve. *Brotherhood 2017*, 879 F.3d at 759. The instant decision is limited to the Court's role as taxonomist. The evidence before the Court shows a "pattern [which] established beyond dispute that [BNSF] stood on solid ground in considering the [Union's] challenge to the [Yard Foreman's responsibilities] to reflect a minor dispute --- a challenge to the company's exercise of authority implied and established as part of existing collective bargaining agreements through the parties' course of dealing." *BLET GCA UP*, 988 F.3d at 414.

The Union counters that the dispute in this case is "major" because BNSF is effectively creating a new "Hybrid" position. As the Union sees it, only engine service employees (who are represented by a different union) may operate locomotives, and in turn, they are the only employees who can be required to become Engine Service Qualified. In contrast, train service employees (including Yard Foreman) cannot operate locomotives. By requiring the Yard Foreman to become Engine Service Qualified, the Union believes BNSF is attempting to create a new position that contains components of both the train service function (performing the switching

function) while also performing the engine service employee function (obtain the necessary qualification to operate the locomotive).

The evidence in the record shows that the course of dealing between BNSF and the Union on this point is not as the Union suggests. The record does not demonstrate a sharp division between the train and engine service employees as argued by the Union. As explained above, the Yard Foreman is already effectively a "Hybrid" position possessing components of the yard service and engine service functions as it is responsible for directing the locomotive (engine service) during the switching process (train service) via remote control. The Court appreciates that directing of the locomotive during switching via remote control does not require the operator to be Engine Service Qualified yet performing the same task on the locomotive using the conventional controls does require the certification. But, for purposes of the instant dispute, it appears to the Court to be a distinction without a difference. BNSF is not attempting to create a new "Hybrid" position as the Union argues, this "Hybrid" position already exists.

The Union's view of a sharp distinction between train and engine service employees is further undermined by the fact that there is movement back and forth by employees between the two functions. Engine service employees are promoted from the ranks of train service employees and engine service employees may return to the train service function. (Dkt. 22-1, pg. 3.) As of August 2020, one out of every three active train service employees at BNSF was Engine Service Qualified. *Id*. at 4. In sum, the record does not support the Union's argument that established practice between the parties is a sharp separation between train and engine service employees. BNSF's desire to impose an additional requirement on the Yard Foreman position of mandating

that all in the position be Engine Service Qualified is not a sharp break from past practice for the position.[3] This is further evidence suggesting the dispute is "minor."

The final piece of evidence demonstrating this is a "minor" dispute is the 1985 written agreement. The agreement was reached between the National Carriers' Conference Committee and the United Transportation Union. (Dkt. 22-1, pgs. 2, 6; Dkt. 28-1.) There is no dispute that the parties are covered by this agreement as BNSF is a member of the National Carriers' Conference Committee, and United Transportation Union is Plaintiff Union's prior name. (Dkt. 22-1, pgs. 2, 6.) The relevant portion of the agreement states:

> Road and yard employees in engine service and qualified ground service employees may perform the following items of work in connection with their own assignments without additional compensation:
>
> (2) move, turn and spot locomotives and cabooses . . .
>
> (5) start or shutdown locomotives . . .
>
> (10) any duties formerly performed by fireman.

(Dkt. 22-1, pg. 6; Dkt. 28-1, pgs. 3-4.)

---

[3] The parties make two other arguments on this point. First, BNSF points out other job positions that are "Hybrid" in nature of train service employees operating the locomotive including two that are Union represented. The Union concedes that there are two positions, Hostlers, who move locomotives without train cars, and Fireman, who operate locomotives under the supervision of engineers, that perform a "Hybrid" function. (Dkt. 22-1, pg. 5.) The Court finds this point to be marginally relevant. Yes, these are examples of other "Hybrid" positions, but it does not inform as to the extent of the parties' past bargaining on the Yard Foreman's position. As discussed above, the Court places considerably more weight on the fact that the Yard Foreman is effectively already performing the "Hybrid" function when directing the locomotive with the remote-control during switching.

Second, BNSF points out that historically the Engineers' Union had argued that only engine service employees, who were members of that union, had the exclusive right to operate the locomotive's conventional controls. (Dkt. 22-1, pg. 5.) However, in 2007, BNSF reached a new agreement with the Engineers' Union in which that union agreed that "Hybrid" positions could be established for the switching activity and that engine service employees were not required to move locomotives during the switching process. *Id*. at 7-8. That agreement allowed train service employees to move the locomotive by remote control or conventional controls (if the employee was properly certified to perform conventional operation). *Id*. at 8. SMART-TD notes it was not a party to the agreements between BNSF and Engineers' Union. The Court fails to see how an agreement between BNSF and a third-party union that is not a party to this litigation informs the scope of whether a collective bargaining exists between the parties in this case as to the Yard Foreman position.

The Union counters that the language involves work "in connection with their own assignments . . ." (Dkt. 22, pg. 7.) It understands the agreement to cover train service employees who already move locomotives as an incidental duty such as Hostlers and Fireman. The Union believes that Yard Foreman are not in the business of moving locomotives, are not covered by this agreement, and so this agreement cannot be used to show that the present dispute is "minor."

Leaving aside the fact that the Yard Foreman do move the locomotives when using the remote control suggesting they are in the class of employees covered by the agreement (instead of only Hostlers and Fireman as the Union argues), the ultimate point is that it is not for the Court to resolve the issue. "The burden on a railroad to convince the Court that its changes are only an interpretation or application of an existing CBA is quite low. If the railroad can articulate an argument that is 'neither obviously insubstantial or frivolous, nor made in bad faith,' the court lacks jurisdiction to do anything but dismiss the case and allow arbitration to go forward." *Brotherhood 2017*, 879 F.3d at 758 (quoting *Conrail*, 491 U.S. at 310). BNSF's argument on the 1985 agreement meets this "quite low" burden. In sum, BNSF demonstrates that this case presents a "minor" dispute. It is entitled to dismissal of this action for want of subject matter jurisdiction, and the dispute resolved by the arbitrator.

There is one final matter that requires the Court's attention. The Union asserts that from 2012 through 2014, BNSF and one of the Union's general committees of adjustment (which is responsible for engaging in collective bargaining) negotiated a proposed agreement regarding "Hybrid" work by BNSF employees including the Yard Foreman engine certification at issue in this case. (Dkt. 21-1, pg. 7.) The agreement, however, was rejected by the Union rank and file membership. *Id*.

The Union argues that BNSF persisted in its desire to create the "Hybrid" Yard Foreman position and so served a Section 6 notice on the Union in November 2019. *Id*. at 8. The filing of a Section 6 notice sets off the mandatory negotiation and mediation process just like the Court's finding of a "major" dispute. 45 U.S.C. § 156; *Chicago & Nw. Transp. Co. v. Ry. Labor Executives' Assoc.*, 908 F.2d 144, 147 (7th Cir. 1990). Despite bringing the Section 6 notice, BNSF now attempts to unilaterally impose the Engine Service Qualified requirement for the Yard Foreman.

The Union believes the fact that BNSF previously attempted to negotiate the change and now brings the Section 6 notice on this point is evidence this is a "major" dispute. Put another way, it is clear that when the Court finds there is a "major" dispute, the parties must proceed to mandatory bargaining and mediation. But, when a party previously put the issue to mandatory bargaining and mediation, does that also mean the issue is *per se* a "major" dispute?

The Court concludes the answer is "no." It is the Court's role to determine whether the dispute is "major" or "minor," and the Court may "substitute its characterization for that of the claimant." *Conrail*, 491 U.S. at 306. The "[f]iling [of] a section 6 notice may kick off a major dispute; it does not transform a minor dispute into a major one." *Chicago & Nw. Transp. Co.*, 908 F.2d at 158.[4] As the Court previously determined this to be a "minor" dispute, the implication is that any previously filed Section 6 notice does not transform this "minor" dispute into a "major" one. *International Ass'n of Sheet Metal, Air, Rail and Transp. Workers, Transp. Div. v. BNSF Ry.*

---

[4] The Court appreciates that the *Chicago & Nw. Transp. Co.* case is a slightly different factual context from the instant case. In that case, the Seventh Circuit was considering a Section 6 notice filed by a union. 908 F.2d at 158. In theory, a union would prefer to call disputes "major," and *Chicago & Nw. Transp. Co.*, is explaining that a union cannot use Section 6 notices as a backdoor to convert "minor" disputes into "major" ones. But, BNSF asserts that it may desire at times to engage in the negotiation process under a Section 6 notice even though the dispute is minor. (Dkt. 21, pg. 6) (explaining that it can desire to engage in collective bargaining even though it already has an established contractual right in order to further clarify bargained for rights or if the rights are part of a larger omnibus negotiation). BNSF's argument on this point does not strike the Court as "obviously insubstantial or frivolous, nor made in bad faith," and so the Court shall accept it. *Conrail*, 491 U.S. at 310.

*Co.*, No. C15-1270RSL, 2015 WL 5159201, at *2 (W.D. Wash. Aug. 24, 2015) ("Nor does SMART–TD explain why a party's unilateral decision to serve a Section 6 notice would upend the analysis set forth in *Conrail* and the statutory distinctions between "major" and "minor" disputes. Even if BNSF had filed a Section 6 notice . . . and then later realized that it had the option to proceed under [a collective bargaining agreement], its initial characterization of the dispute would not be binding on the courts.").[5]

The final arrow in the Union's quiver is *Burlington N. R.R. Co. v. United Transp. Union*, 862 F.2d 1266 (7th Cir. 1988) ("*BNSF 1988*"), a prior dispute between the two parties in this case. In *BNSF 1988*, BNSF wanted to create a new lower-priced train service. *Id*. at 1269. BNSF was able to successfully negotiate the necessary labor concessions with local union membership to facilitate the lower cost train service in various locations, but was unable to obtain the necessary concessions from union employees working on its Northern Line running from Minnesota to Washington State. *Id*.

To implement the new discount service on the Northern Line, BNSF contracted with its subsidiary, Winona Bridge, to operate on the Northern Line. *Id*. Prior to the agreement, Winona Bridge assets consisted of an out of service bridge and operating equipment over 1.07 miles of track. *Id*. It employed five workers who did not operate any trains. *Id*. Under the new agreement, Winona Bridge would now operate 1,860 miles of track on the Northern Line. *Id*. The advantage to BNSF was that Winona Bridge was effectively an empty corporate shell with no existing

---

[5] The Court's finding that this is a "minor" dispute contrasts this case from *Wheeling & Lake Erie Ry. Co. v. Brotherhood of Locomotive Engineers and Trainmen*, 789 F.3d 681 (6th Cir. 2015), cited by the Union. In that case, the federal court performed its function of classifying the dispute concluding it was "major." *Id*. at 693. The Court noted that the railroad had served a Section 6 notice, but that fact was not the basis for the "major" finding. Instead, the Court looked to the plain language of the "Scope Rule in Article I of the Trainman Agreement" when making the "major" finding. *Id*. at 693-94. The Sixth Circuit explained that the railroad's filing of the Section 6 notice was consistent with its finding of a "major" dispute, but it did not hold the dispute was "major" because of the Section 6 notice.

collective bargaining agreements with the unions allowing it to hire employees under the new lower cost structure necessary for the new discount train service. *Id*. The Seventh Circuit concluded the dispute was "major." *Id*. at 1274. Moreover, the Court of Appeals repudiated BNSF's effort to use Winona Bridge explaining that "a carrier cannot evade its duties under a collective bargaining agreement or the [Railway Labor Act] by directing business to an entity within the same corporate family and not obtained by the existing collective bargaining agreement." *Id*. at 1275.

*BNSF 1988* is of no help to the Union in this case. The federal court in that case performed its obligation of characterizing the dispute as either "major" or "minor." There was no reliance on a Section 6 notice or similar statement by BNSF in the major / minor determination. Notably, BNSF did not file a Section 6 letter in that case. What it did send was a letter to its employees admitting to using Winona Bridge as a subterfuge. *Id*. at 1274. *BNSF 1988* stands for the proposition that a railway cannot avoid the mandatory negotiation and mediation process through use of a corporate subsidiary when faced with a "major" dispute, and an admission that the company used the corporate subsidiary improperly will be considered by the federal court. In contrast to *BNSF 1988*, the record demonstrates that the dispute in this case is "minor," and there is no indication that BNSF is engaging in any type of malfeasance to avoid its statutory obligations under the Railway Labor Act in the instant dispute.

In sum, this dispute is "minor," and the parties must resolve it via arbitration. BNSF is entitled to dismissal of this case for want of subject matter jurisdiction.

## III. CONCLUSION

Defendant BNSF Railway Company's motion to dismiss for want of subject matter jurisdiction (Dkt. 17.) is granted. Plaintiffs' International Association of Sheet Metal, Air, Rail

and Transportation Workers, Transportation Division, SMART-TD General Committee of Adjustment GO-01, SMART-TD GCA GO-009, and SMART-TD GCA GO-393's motion for summary judgment (Dkt. 16.) is denied. Any pending motions are moot. The Clerk is instructed to enter a Rule 58 judgment in favor of Defendant and against Plaintiffs finding that the dispute is "minor" under Railway Labor Act. Civil Case Terminated.

ENTERED:


Date:   July 1, 2021 /s/ William T. Hart
WILLIAM T. HART
United States District Court Judge